## UNITED STATES v. LINDE AIR PRODUCTS CO.

### No. 46 C 785.

United States District Court
N. D. Illinois, E. D.
May 3, 1949.

Melville C. Williams, Willis L. Hotchkiss and Harry H. Faris, al' of Chicago, Ill., for the Government.

Cahill, Gordon, Zachry & Reindel, of New York City, and Daily, Dines, White & Fiedler, of Chicago, Ill., for defendant.

CAMPBELL, District Judge.

This is a civil proceeding, brought by the Government, for alleged violations of Section 2 of the Sherman Act and Section 3 of the Clayton Act. The pertinent portions of those sections are:

Section 2 of the Sherman Act: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *." 15 U.S.C.A. § 2.

Section 3 of the Clayton Act: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to * * * make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States * * * or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C.A. § 14.

The complaint charges that "Beginning in or about May 1938 and continuing to and including the date of the filing of this complaint, defendant Linde, in violation of Section 2 of the Sherman Act, has attempted to monopolize, and has monopolized, sales

in interstate trade and commerce of welding rods used in the Unionmelt Welding Process by entering into contracts with about 80 per cent of the users of the Unionmelt Welding Process for the sale of welding rods for use in said process within the United States, each contract being on the condition, agreement, or understanding that the purchaser shall not use welding rods of a competitor of Linde in the Unionmelt Welding Process. Said contracts and each of said contracts substantially lessen competition in, and tend to create a monopoly of, the sale of welding rods used in the Unionmelt Welding Process in violation of Section 3 of the Clayton Act."

The Unionmelt Welding Process is the subject of United States Patent No. 2,043,-960 issued June 9, 1936 to defendant as assignee of the inventors Lloyd Jones, Harry Kennedy and Maynard Rotermund, who filed the patent application on October 9, 1935. The patent relates both to a process or method of electric welding, and to compositions for use therein. Litigation as to the validity of the claims of the patent developed subsequently, as a result of which, judicial determination has been made of validity. The United States Supreme Court in a recent decision, Graver Tank & Mfg. Co. v. Linde Air Products, 335 U.S. 810, 69 S.Ct. 50, upheld the validity of flux claims 18, 20, 22 and 23. The Court held to be invalid flux claims 24, 26 and 27, and all process claims. Flux claims 19, 21, 25, 28 and 29 were not in issue.

There is no dispute between the parties as to the outstanding nature of the Unionmelt invention. It represented a remarkable improvement in the field of electric welding, and apparently caused a tremendous impact upon the manufacturing world. For example, the performance capabilities of the Unionmelt Process included:

(1) Welding steel plate 2½ inches thick in a single pass (one traverse along the seam to be welded) as compared with a maximum of ½ inch with any prior process.

(2) For the first time, welds of the highest quality—usable in high pressure boilers and other dangerous instrumentalities—could be produced automatically using a bare rod.

(3) Welding speeds and currents were multiplied many times over pre-existing maxima.

Installation of the process on a production basis generally involved considerable equipment and expense—a further testimonial to its industrial worth.

The foregoing discussion of the Unionmelt Process is, of course, undeterminative directly of the issues presented in this cause of action, but the Court deems it a necessary prelude in order that the subsequent activities of Linde might be considered against their proper background. It is entirely possible that defendant's operations could become distorted if viewed in the normal business perspective, rather than in the abnormal setting resulting from the introduction of a revolutionary industrial process.

The first public announcement of the Unionmelt Process was made in October, 1938. Since that time, Linde has offered to license this process on standard terms to all applicants. In the early phases of the licensing program, Linde was the sole source of supply for rod suitable for use in the process. Linde has never manufactured its own welding rod, but purchases it from other concerns and, in turn, resells it to its licensees. Originally, nearly 100% of the rod used in the process was a patented rod—"Oxweld 29", patent to which was held by Linde and which expired in 1940. Except for special applications, apparently practically any steel rod may be used in the process, and there are now many concerns selling rod and wire which are suitable. Licensees are obliged to pay royalties on the basis of the amount of metal deposited in the welding operation. Therefore, if no metal is deposited, no royalty is due; and the royalty is due whether the licensee uses defendant's rod or not.

From the commencement of its licensing program, defendant atempted to sell all its welding rod under the following form of contract: "The seller (Linde) agrees to sell and deliver, and the buyer agrees to purchase and take delivery of * * * the Buyer's entire requirements of bare rod electrodes for use in a process of electric welding known as the Unionmelt Weld-

ing Process * * * for the period of one (1) year beginning on the — day of 19— and continuing after said period from year to year until cancelled at the end of any then current contract year by notice. in writing to that effect given by either party hereto to the other not less than 60 days prior to the end of such then current contract year."

Substantially, this was the form of contract signed by all contracting licensees. Approximately 528, or 81%, of the 651 licensees were also parties to these entire requirements contracts. About 95% of all rod deposited by licensees, is so deposited under this type of contract. Purchasers under the entire requirements contracts receive a ½¢ per pound discount from the non-contract price. However, shortly after the commencement of this action, defendant cancelled all outstanding · requirements contracts, having discovered them to be more of a burden than a blessing. This was due to cost increases in the post-war period which had not been anticipated or provided for at the time the contracts were executed.

■ The Government has advanced the proposition that the requirements contracts sponsored by defendant are illegal per se. However, its theory does not conform to the recent view of the Supreme Court as expressed in the case of United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533:

"Where a complaint charges such an unreasonable restraint as the facts of the Yellow Cab case show, the amount of interstate trade affected is immaterial in determining whether a violation of the Sherman Act has been charged. A restraint may be unreasonable either because a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint or because it falls within the class of restraints that are illegal per se. For example, where a complaint charges that the defendants have engaged in price fixing, or have concertedly refused to deal with non-members of an · association, or have licensed a patented device on condition that unpatented materials be employed in conjunction with the patented device,

then the amount of commerce involved is immaterial because such restraints are illegal per se. Nothing in the Yellow Cab case supports the theory that all exclusive dealing arrangements are illegal per se. * * ·*

"The legality of the acquisition by United States Steel of a market outlet for its rolled steel through the purchase of the manufacturing facilities of Consolidated depends not merely upon the fact of that acquired control but also upon many other factors. Exclusive dealings for rolled steel between Consolidated and United States Steel, brought about by vertical integration or otherwise are not illegal, at any rate until the effect of such control is to unreasonably restrict the opportunities of competitors to market their product."

■ Having, therefore, concluded that the contracts are not illegal per se, it remains for the Court to determine whether they otherwise constitute an unreasonable restraint. In other words, it must be shown by the Government that the restraint accomplished by Linde in this case was accompanied by an intent to achieve a forbidden restraint. One of the factors to be considered in determining the legality of defendant's operations is the character of the market to be served, and the leverage on that market which this particular activity created or made possible. A second important test is the intent or purpose with which the operation was conceived. When a plan, through its actual operation, results in an unreasonable restraint, intent or purpose may be inferred; and, even though no unreasonable restraint may be achieved, nevertheless a finding of specific intent to accomplish such an unreasonable restraint may render the actor liable under the Sherman and Clayton Acts.

In attempting to meet the above tests, the Government introduced considerable statistical evidence which was intended to prove that, since approximately 95% of all rod deposited by licensees had been purchased from defendant under requirements contracts, defendant actually did, and so intended to, unreasonably restrain trade and restrict the opportunities of competitors to market their product. However, this con-

clusion may merely be legitimately inferred, and is not the inevitable end-point of syllogistic reasoning. It is not inconceivable that competitors of an alleged monopolist find it impossible to sell their products simply for the reason that the prospective customers are too well satisfied with the good salesmanship and excellent service of said monopolist. It must be remembered that, in the case at bar, defendant was the sole company to make welding rod stocks available in proper quantities, condition and analyses for a considerable length of time after the Unionmelt Process was introduced to the public. Furthermore, throughout the years the process has been in existence, defendant has devoted itself constantly to research in order to develop the ideal rod to be used on any particular production job. It may be true, generally, that any type of wire may be employed in the process, but such fact does not mean that satisfactory results could be achieved. These services, rendered by defendant, I am convinced are what brought customers to Linde initially and what retained them over the years. Admittedly, the requirements contracts bound the customers to defendant during the course of one year, but can that period of time be construed as being unreasonable? A requirements contract which would bind a purchaser for ten or twenty years would undoubtedly be contrary to the public interest and, therefore, unreasonable; but a one-year contract should not be relegated to the same category. It would appear to be no more than a normal and reasonable business plan, by which both parties' operations for the year could be projected more efficiently and accurately. In any event, defendant's customers were under no compunction to execute the contracts in the first instance, nor to continue them for a longer period than the one year stipulated therein. True, the agreement contained a provision for automatic renewal; but there was nothing surreptitious about it, nor was the process of cancellation at the end of the contract year burdensome to the purchaser.

The Government attached considerable importance to the following typical statements made by officers of defendant corporation, as indicating a purpose and a plan to exclude competitors from the welding rod field:

(a) Government's Exhibit No. 18

" * * * Although we want and expect to obtain the rod business * * *. If a Unionmelt licensee should mention the possibility of some other source of rod, we must admit there is no obligation in the Unionmelt welding process license agreement to buy our rod. However, besides the obvious advantage of a rod contract to us in assuring us the business, making possible quantity purchases and giving some basis for warehouse stock control, there are several advantages to using our rod."

(b) Cornwell Cross-examination—R. 286, 287

"Q. As a matter of fact, didn't you always, prior to the time of the filing of this complaint, urge your subordinates to secure from licensees entire requirements contracts, if it was at all possible? A. We were anxious to sell all the rod we could, and if that was a means of getting the rod business, that was the proper channel to follow, yes."

(c) Government's Exhibit No. 25—"Rod for Unionmelt welding is invariably furnished by us."

(d) Government's Exhibit No. 30—"If you have any thoughts or suggestions in handling this matter they would be appreciated although we definitely left the idea with Mr. Ebersole that our agreement, because cancellation privilege had not been exercised, was in effect for at least another year."

However, it must be remembered that, to a limited degree, any sale of goods by a vendor necessarily involves the exclusion of a competitor, at least temporarily. The Court would not classify these statements as more than normal expressions of concern for sales that might well come from the lips of any businessman in the country, who intended to maintain his business as a going concern.

Had defendant extended itself no further in its attempts to secure the welding rod business to itself by means of the entire requirements contracts alone, the court would be constrained to hold that no violation of the Anti-trust Acts had occurred. Defend-

ant, however, introduced the additional element of a ½¢ per pound discount for all rod purchased under requirements contracts. In view of the fact that some purchasers bought in quantities of several hundred thousand pounds at one time, a discount of this size would certainly not be "de minimis".

This discount, used, as it was, in conjunction with the entire requirements contracts in my opinion constituted a violation of Section 3 of the Clayton Act at least insofar as that Statute states: " * * * where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." Admittedly the Government failed to introduce any evidence as to what prices had been established by competitors of defendant; but it seems a fair assumption that the discount rendered defendant's price lower than that of its competitors. The combination of the discount and the requirements contracts clearly tended to lessen competition to a substantial degree and to create a monopoly. The case of Lipson v. Socony Vacuum Corp., 1 Cir., 87 F.2d 265, 269, although not cited by either party herein, seems to express the view most favorable to defendant's present position:

"The question is, where the requirement that a sale of gasoline in tank cars and at a less price than in case of delivery in smaller quantities by tank trucks will only be made in case the retailer agrees to sell only the defendants' products, results in a lessening of competition in interstate transactions between the plaintiff and stations operated by the Standard Companies and by others in the same competitive territory, to the damage of the plaintiff?

"It is obvious from his declarations that the defendants' policy does not affect the amount of sales by the plaintiff of the defendants' products, but only his profits, since the inference is clear that he has supplied all demands of his customers for 'Socony' gasoline, though at a less profit than if he could buy on the tank car market. He does not allege, however, in his amended declaration, that he is equipped to accept gasoline at his filling station in tank cars, or that his profits are so small that he must give up supplying his customers with 'Socony' products. The inference is also clear that he buys and sells the products of other integrated or independent companies on the same terms as those of the defendants. There is obviously no discrimination in terms or price between him and other retail customers of the defendants. He is offered the same terms by the defendants as any other retail customer; and since it is alleged that all retailers sell at the same price, which is posted on their pumps at their retail outlets, and that the selling price of all gasoline is the same, at least throughout Massachusetts, competition in price, therefore, cannot result as between him and other retailers, though they deal exclusively in 'Socony' products.

" 'Competition' is defined as: 'The effort of two or more parties, acting independently, to secure the custom of a third party by the offer of the most favorable terms.' Webster's Dict. 'The struggle between rivals for the same trade at the same time; the act of seeking or endeavoring to gain what another is endeavoring to gain at the same time.' 12 C.J. 237. This, according to the plaintiff's declaration, his competitors are not seeking to do by offering more favorable terms of sale of Socony products to purchasers.

"While we think it is alleged with substantial certainty that the defendants have fixed lower prices for their products in case of the importation of gasoline in tank car lots direct to their customers, provided the customer agrees to deal only in their products, yet it does not appear, owing to there being no competition in price between the plaintiff and other retailers of gasoline, that the result of defendants' policy is to substantially lessen competition in gasoline and other petroleum products between the plaintiff and stations operated by the Standard Companies, or those dealing exclusively in defendants' products, in the same competitive territory. If the plaintiff chooses to sell petroleum products of other competing companies of the defendants rather than to deal in the defendants' products exclusively, it does not follow, as a matter of law, that a

refusal by the defendants to sell gasoline to the plaintiff at tank car prices constitutes a violation of the Clayton Act".

Concededly, the Lipson case might well be authority for the proposition that no right of action under the Anti-trust Acts accrues to an individual purchaser who, in order to receive a discount, must buy his entire requirements from a particular supplier. However, the same rule does not apply where the offense charged is a substantial lessening of competition between the particular supplier and other suppliers, similarly situated. Under the facts existing in the Lipson case, competition was not destroyed between retailers of gasoline, but rather since they all charged the same price, certain retailers suffered a reduction of margin of profit to a limited degree. In the case at bar, however, it is not inconceivable that competitors of defendant might be eliminated from the field entirely by means of the combination of the discount and requirements contracts. Defendant's practices have been essentially the same as those condemned in Carter Carburetor Corp. v. Federal Trade Comm., 8 Cir., 112 F.2d 722, 725, 732, wherein it was stated:

"The petitioner thus has established within its own control a complete system of retail price maintenance, effective as to all sales to both contract and general cabinet service stations.

"The purpose and effect of General Bulletin No. 134 must therefore be considered in the light of that situation. The Bulletin advised that the preferential discount would be discontinued if a new carburetor line (defined as a carburetor made after June 23, 1934) was taken on without petitioner's written approval. Petitioner gave instructions that if the service stations 'should elect to keep the other line * * * · the standard trade discount of 25% would then apply'. Petitioner's telegram to its field representatives states that 'until they make up their minds twenty-five per cent will be their discount'. The policy was enforced by increasing prices to some service stations which refused compliance and by threats of reduction of discounts made to others and by cancellation of contracts. It was made perfectly clear to all service stations, that their preferential discount would be available only on condition that they did not carry or take on a new competing line. Under these circumstances it is immaterial that those who handled petitioner's products were not obliged to affirmatively promise in express terms not to handle goods of Carter's competitors. The condition against handling the goods of competitors was made as fully effective as though it had been written in and affirmatively agreed to in express terms in the contracts. Of course it was necessary that petitioner's distributors should cooperate to effectuate the purpose because the distributors were the immediate source from which the service stations obtained their stocks directly. But there is, and was, no doubt that such cooperation was complete, both in actual practice and according to the terms of the contracts between petitioner and distributors. The arguments presented as to the right of an individual to contract or refuse to contract with whom he pleases must be related to the provisions of Section 3 of the Act and the limitations there imposed. The service stations contracts were intended to and did impose a condition that the purchaser should not deal in the goods of a competitor of petitioner within the prohibition of Section 3."

Similarly, in the case at bar, no affirmative promise was exacted from the various licensee-purchasers that they would not use a product competitive to that of defendant, but the discount, used in conjunction with the requirements contracts, patently imposed the condition, although indirectly, that such purchasers would not use the products of competitors. So employed, the practice is violative of Section 3 of the Clayton Act.

Defendant contends strongly that, in any event, the question is now moot and an injunction should not issue, even though its prior activities may have been violative of the Anti-trust Acts. In support of this theory, defendant states in its brief: " Earlier in this brief the facts have been set forth as to the origin of Linde's use of requirements contracts for the sale of welding rod, the practical nullification of the opera-

tion of these contracts during the wartime period and the final abandonment of the contracts under post-war conditions of steel supply and prices. It has further been shown that the conditions which gave rise to the contracts no longer exist, and that instability of steel prices and shortness of supply may be expected to continue. Therefore there is no basis for belief that Linde will desire, or will be able, to use such contracts in the foreseeable future."

In regard to this assertion of mootness, it should be noted that the illegal practices were abandoned by the defendant of its own volition, as a result of economic expediency. Presumably, then, if advantageous economic factors were present in the future, defendant might voluntarily resume the practices which gave rise to the present action. Indeed, that defendant would contemplate such a move may be inferred legitimately from the testimony of Mr. Cornwell, a vice-president of Linde (R. 177–8). The rule as to whether a particular question has become moot was clearly stated in United States v. Trans-Missouri Freight Association, 166 U.S. 290, 17 S.Ct. 540, 546, 41 L.Ed. 1007:

"* * * If the mere dissolution of the association worked an abatement of the suit as to all the defendants, as is the claim made on their part, it is plain that they have thus discovered an effectual means to prevent the judgment of this court being given upon the question really involved in the case. The defendants having succeeded in the court below, it would only be necessary thereafter to dissolve their association and instantly form another of a similar kind, and the fact of the dissolution would prevent an appeal to this court or procure its dismissal if taken. This result does not and ought not to follow. * * *

"Private parties may settle their controversies at any time, and rights which a plaintiff may have had at the time of the commencement of the action may terminate before judgment is obtained or while the case is on appeal, and in any such case the court, being informed of the facts, will proceed no further in the action. Here, however, there has been no extinguishment of the rights (whatever they are) of the pub-

lic, the enforcement of which the government has endeavored to procure by a judgment of a court under the provisions of the act of congress above cited. The defendants cannot foreclose those rights, nor prevent the assertion thereof by the government as a substantial trustee for the public under the act of congress, by any such action as has been taken in this case. * * *"

Nothing contained in the language of United States v. Hamburg-American S. S. Co., 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387, serves to strengthen the position assumed by defendant on this question. That case is merely authority for the proposition that the subject is rendered moot by the intervention of a power beyond the control of either party, but does not purport to establish the rule that a defendant can make it moot by interjecting its own voluntary act.

For the reasons expressed above, I conclude that the combination of the entire requirements contracts and the discount granted in connection therewith, constitutes a violation of Section 3 of the Clayton Anti-Trust Act; and that the question of such violation is not now moot. The Government is, therefore, entitled to the injunctive relief prayed for in the complaint.

Counsel for the plaintiff may prepare and file with the Court, in writing, within thirty days from the date hereof, proposed findings of fact, conclusions of law, and a draft of a proposed decree, consistent with the views herein expressed, delivering copies thereof to counsel for the defendant. Within thirty days of the receipt of such copies, counsel for the defendant may prepare and file with the Court, in writing, his observations with reference thereto and suggestions for the modification thereof, delivering a copy of such observations and suggestions to counsel for the plaintiff. Within ten days thereafter counsel for the plaintiff may present to the Court, in writing, his reply to such observations and suggestions. Whereupon, the matter of making findings of fact, conclusions of law and a decree herein will be taken by the Court without further argument.