**ANCHOR SERUM COMPANY**

v.

**FEDERAL TRADE COMMISSION.**

**No. 11164.**

United States Court of Appeals
Seventh Circuit.

Dec. 17, 1954.

MAJOR, Circuit Judge.

This is a petition by Anchor Serum Company, a corporation, to review and set aside a cease and desist order issued February 16, 1954, by the Federal Trade Commission (respondent), at the conclusion of proceedings on a complaint charging petitioner with violation of § 3 of the Clayton Act, 15 U.S.C.A. § 14. The order is directed not only at the corporate petitioner which alone was made a party to the complaint, but also at its "officers, agents, representatives, and employees."

Petitioner was incorporated in 1917, and since that time has been engaged in the manufacture, distribution and sale of various animal health products, principally anti-hog cholera serum and hog cholera virus, with its principal place of business at St. Joseph, Missouri. Since the year 1936, it has been licensed to produce and sell its products by the Bureau of Animal Industry, United States Department of Agriculture. Petitioner sells its products to customers variously denominated as wholesalers, dealers and consumers, located throughout the various states of the United States.

There are thirty-two manufacturers who produce, sell and distribute serum and virus in the same trade areas as petitioner and who are in competition with petitioner for customers who resell or use said products. All such manufacturers are known in the trade as either "lay" or "vet" producers, such characterization being determined by and descriptive of the type of customer to whom they sell. "Vet" producers sell principally to veterinarians or to wholesalers who resell exclusively to veterinarians, and "lay" producers sell through other channels, such as drug stores, farm bureaus, wholesalers, etc. Of the thirty-two manufacturers of such products, twenty-three are "vet" and nine are "lay" producers. Petitioner falls within the latter category and is the largest producer of that group. While petitioner is in direct competition only

L. M. McBride, Chicago, Ill., James T. Welch, Washington, D. C., for petitioner.

Robert B. Dawkins, Asst. Gen. Counsel, James E. Corkey, Atty., Earl W. Kintner, Gen. Counsel, Federal Trade Commission, Washington, D. C., for respondent.

Before DUFFY, Chief Judge, and MAJOR and SCHNACKENBERG, Circuit Judges.

with other "lay" producers, it is in competition with all producers in the sense that they all compete for the ultimate consumer market, viz., the farmer-hog owner.

At the time this case was heard by the Commission, petitioner had contracts with sixteen wholesalers for the sale of its serum, virus and other pharmaceuticals. Five of such wholesalers are designated by petitioner as "ex-branch wholesalers," which are located in different states and do business under the name of "Anchor Serum Company." They are thus designated because they were all at one time owned by petitioner and sold to the manager of the branch under a contract which authorized the new ownership to use petitioner's name and good will. Seven of the sixteen wholesalers are designated as "Anchor wholesalers," each of which does business under the name of "Anchor Serum Company." While these wholesalers are and always have been independent of petitioner, they have by contract acquired the right to use the word "Anchor" in their business operations. The remaining wholesalers, four in number, are co-operatives, namely, Illinois Farm Bureau Serum Association, Iowa Farm Serum Company, Missouri Farmers Association, Inc., and Arkansas Farmers Association.

The first of the contracts in controversy was entered into with Anchor Serum Company of Indiana (one of the five ex-branch wholesalers) April 30, 1943, and provided in part as follows:

"* * * and in further consideration of the use by the parties of the second part of the word 'Anchor' as a part of their name in any partnership or other form of business association, approved in writing by the party of the first part, the parties of the second part agree to purchase from the party of the first part, all their requirements of products manufactured and/or distributed by the party of the first part * * *."

In 1947, petitioner entered into contracts with the Illinois Farm Bureau Serum Association and the Iowa Farm Serum Company, each of which was the largest distributor of serum and virus in its state, which contracts obligated the purchasers "to buy, and does by these presents buy, and agrees to pay for all of its requirements of serum, virus and other products at the prices and on terms specified herein."

We need not further relate the inhibiting provision contained in all of the contracts because what we have set forth is typical of the provision which each contains. Furthermore, petitioner concedes that all of the contracts contain "requirements" language which means that the contracting party is obligated by the contract to purchase from the petitioner all its requirements of the designated products.

Section 3 of the Clayton act, so far as here pertinent, makes it unlawful to "make a sale or contract for sale of goods, wares, merchandise, * * * on the condition, agreement, or understanding that the * * * purchaser thereof shall not use or deal in the goods, wares, merchandise, * * * of a competitor or competitors of the * * * seller, where the effect of such * * * sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

Petitioner devotes much effort to what we think is an erroneous approach to the essential issue for decision, as is disclosed in its enumeration of the contested issues which are stated as follows:

"1. Do the so-called requirements contracts of the Petitioner impose on any one or more of the sixteen customers who are parties to those contracts, illegal conditions of sale prohibited by Section 3 of the Clayton Act?

"2. Even if it be determined that any one or more of those contracts impose illegal conditions of sale, does the record support the conclusion that the contracts in question have

substantially lessened competition and tend to create a monopoly?"

Having thus stated the contested issues, petitioner in its brief presents its argument under two headings, (1) "No Contract Under Review Imposes An Illegal Condition On Any Of Petitioner's Customers," and (2) "Petitioner's Contracts Have Not Substantially Lessened Competition And Do Not Tend To Create A Monopoly."

■ In Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356, 42 S.Ct. 360, 362, 66 L.Ed. 653, the court stated, with reference to the section of the Clayton Act now under consideration:

"Section 3 condemns sales or agreements where the effect of such sale or contract of sale 'may' be to substantially lessen competition or tend to create monopoly. It thus deals with consequences to follow the making of the restrictive covenant limiting the right of the purchaser to deal in the goods of the seller only. But we do not think that the purpose in using the word 'may' was to prohibit the mere possibility of the consequences described. It was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition, or create an actual tendency to monopoly. That it was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be substantial."

This statement squares with the plain, unambiguous language of the section and, so far as we are aware, has not been deviated from in any subsequent decision of the Supreme Court.

Thus, in our judgment, there was no legal issue before the Commission as to whether the contracts were illegal *per se;* the only legal issue before the Commission, as it is here, was whether the contracts with their restrictive provisions were calculated to have the proscribed effect or consequences.

■■ By reason of petitioner's false approach, it becomes engulfed in numerous contentions which we think are beside the issue. For instance, in some detail it relates the legislative history of the Clayton Act, apparently for the purpose of demonstrating that it was not the intention of Congress to outlaw all so-called "requirements" contracts. The short answer to that argument is that Congress by the plain language which it used did not do so. Only contracts which had the proscribed effect were made unlawful. Furthermore, the plain language which Congress employed dispels all purpose in resorting to legislative history. Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356, 42 S.Ct. 360, 66 L.Ed. 653. There was evidence that some of the contracts, perhaps all, were entered into as a result of negotiations initiated by the purchasers rather than by petitioner. From this premise it is argued that the terms were not imposed by the petitioner and that as a result there was no illegality, even though the contracts had the proscribed effect on competition. The Commission rejected this argument and so do we. Certainly there is nothing in the language of the Act from which it can even be inferred that two classes of contracts were contemplated, depending upon whether the contract was initiated by the seller or the buyer. We think it is a novel theory that the rights, liabilities and obligations of parties to a contract depend upon which of the parties propose it. And we think it immaterial whether the contract was for the benefit of the seller or the buyer. In any event, the determining factor is whether the contract had the proscribed effect.

■ As already noted, five of the contracting purchasers are designated as "ex-branch wholesalers," and seven are designated as "Anchor wholesalers." Those included in the former category were at one time owned by petitioner but sold to the contracting purchaser with the right to use petitioner's trade name, "Anchor." Those in the latter category have likewise acquired by the terms of

the contracts the right to use petitioner's trade name, "Anchor." Substantially the same argument is made as to all the purchasing wholesalers included in these two categories, the effect of which is that contracts with these purchasers were necessary in order to assure the proper use and protection of petitioner's trade name. It is asserted that each of them can do business with any competitor of petitioner simply by surrendering the privilege of using petitioner's trade name, and that for this reason the contracts contain no illegal condition. A short answer to the contention on this score is that § 3 makes no provision or exception for such contingencies. Like all other contracts, they are illegal if they have the proscribed effect. Petitioner's contention on this point, if adopted, would permit an easy avoidance of § 3. Nothing more would be required by the contracting parties, irrespective of the effect which their contract might have upon competition, than that there be included in the contract the right or privilege on the part of the purchaser to use the trade name of the seller.

As might be expected, the Commission places much reliance upon Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371. Petitioner in its brief, consistent with its erroneous approach to the real issue in the case, states, " * * * the Commission places great reliance in this case, presumably on the theory that the Court held the exclusive dealing contracts of Standard to be illegal *per se*." The Commission here makes no such contention and the Supreme Court in the Standard Oil Company case created no basis for such a theory. Moreover, the opinion in Standard Oil is of no benefit to petitioner, notwithstanding its profession to the contrary. It is true that the court on pages 306–308 of 337 U.S., on pages 1058–1059 of 69 S.Ct. of its opinion discusses "requirements" contracts in connection with the Act here involved in a manner which might prove deceptive in the absence of a careful analysis of the entire opinion in connection with the result reached. The court, in contrasting the character of contracts here involved with "tying" agreements or devices, stated, 337 U.S. at page 306, 69 S.Ct. at page 1058:

"Requirements contracts, on the other hand, may well be of economic advantage to buyers as well as to sellers, and thus indirectly of advantage to the consuming public. In the case of the buyer, they may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand. From the seller's point of view, requirements contracts may make possible the substantial reduction of selling expenses, give protection against price fluctuations, and—of particular advantage to a newcomer to the field to whom it is important to know what capital expenditures are justified—offer the possibility of a predictable market."

It will be noted that the court was discussing the economic advantages which might be inherent in such contracts and then proceeded, following the quoted language, to enumerate a number of factors which might be relevant in determining such advantages from the economic standpoint. The court, however, as we understand the opinion, brushed aside these so-called economic advantages because of their irrelevancy under the plain language of § 3. Following the enumeration of the economic advantages, the court stated, 337 U.S. at page 308, 69 S.Ct. at page 1059, "Yet serious difficulties would attend the attempt to apply these tests." The court, in denying the contention that there must be proof that competition has actually been impaired, stated, 337 U.S. at page 311, 69 S.Ct. at page 1060:

"We are dealing here with a particular form of agreement specified by § 3 and not with different arrangements, by way of integration

or otherwise, that may tend to lessen competition. To interpret that section as requiring proof that competition has actually diminished would make its very explicitness a means of conferring immunity upon the practices which it singles out. Congress has authoritatively determined that those practices are detrimental where their effect may be to lessen competition."

The court made reference to the legislative history of the Act, 337 U.S. at page 312, 69 S.Ct. at page 1061, and pointed out that the qualifying clause, "'where the effect * * * "may" be to substantially lessen competition or tend to create a monopoly'", was added only after the House and Senate bills reached Conference. On the following page, referring to the economic investigation which appellants in that case urged, the court stated, 337 U.S. at page 313, 69 S.Ct. at page 1062:

"To insist upon such an investigation would be to stultify the force of Congress' declaration that requirements contracts are to be prohibited wherever their effect 'may be' to substantially lessen competition."

The crucial language upon which the court's decision was predicated is as follows, 337 U.S. at page 314, 69 S.Ct. at page 1062:

"We conclude, therefore, that the qualifying clause of § 3 is satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected. It cannot be gainsaid that observance by a dealer of his requirements contract with Standard does effectively foreclose whatever opportunity there might be for competing suppliers to attract his patronage, and it is clear that the affected proportion of retail sales of petroleum products is substantial. * * * Standard's use of the contracts creates just such a potential clog on competition as it was the purpose of § 3 to remove wherever, were it to become actual, it would impede a substantial amount of competitive activity."

Thus, this pronouncement reduced to its simple form is that it is not necessary to show the actual impact which a "requirements" contract has on competition, but that it is sufficient if it possesses the potentiality to impede a substantial amount of competitive activity.

Petitioner attempts to bolster its erroneous interpretation of the Standard Oil case by relying upon a subsequent decision of the Supreme Court in Federal Trade Commission v. Motion Picture Advertising Service Co., Inc., 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426. This reliance is also of no benefit to petitioner. In the latter case the court had before it a proceeding instituted under § 5 of the Federal Trade Commission Act, 15 U.S. C.A. § 45. The court distinguished, 344 U.S. at page 397, 73 S.Ct. at page 364, the charge then before the court from a proceeding such as is here involved, that is, a proceeding under § 3 of the Clayton Act. The court did not even mention its previous decision in the Standard Oil case.

■ Having rejected the false premise upon which petitioner seeks to review and set aside the order of the Commission, as shown by its statement of the contested issues as well as its erroneous interpretation of the Supreme Court decision in the Standard Oil case, there appears to be little if anything left to decide. Certainly there is no occasion to enter into a detailed discussion of the findings made by the Commission or the evidence relied upon in support thereof. That the findings are amply supported is hardly open to question. The Commission found not only that the contracts involved furnished a vehicle for the potential impediment to a substantial amount of competitive activity but that they had actually done so. Specific instances are shown and found where the market for serum and virus was substantially foreclosed to producers other than petitioner by reason of the latter's "requirements" contracts.

Petitioner complains that the chief targets of the Commission's attack are the co-operatives, and particularly the Illinois Farm Bureau Serum Association and the Iowa Farm Serum Company. If such be the case, it is reasonable to think that it is because these two wholesalers are the most vulnerable to attack because of the large volume of business which they do, due to their system of distribution and the fact that they sell in the two largest hog producing states. The Iowa organization, for instance, has 137 dealer-members, located throughout the state's 99 counties, and the Illinois organization has 90 dealers, located throughout the various counties of Illinois.

The Commission found, in dollar volume, the amount of business which petitioner did with each of its sixteen contract holders for the years 1949, 1950 and 1951. Without reciting these figures, it is sufficient to note that the volume of business was substantial, and particularly is this so with reference to its two largest wholesale dealers, Illinois Farm Bureau Serum Association and Iowa Farm Serum Company, to each of which its sales during these three years amounted to around one-half million dollars per year. The findings clearly reveal the effect of petitioner's exclusive contracts with the two of its wholesale dealers just mentioned. For instance, Lederle Laboratories, a competitor of petitioner, sold to the Iowa Company serum and virus as follows: 1945, $56,757.57; 1946, $65,211.16; 1947, $17,943.14. The same competitor sold serum and virus to the Illinois Association as follows: 1945, $172,114.08; 1946, $169,338.69; 1947, $125,903.10. After the year 1947, this competitor made no sales to either the Iowa Company or the Illinois Association. 1947 was the year in which both the Iowa Company and the Illinois Association entered into their exclusive agreements with petitioner. It is evident that this competitor was completely stymied in its effort to do business with these two contract holders, and the inescapable inference is it was because the latter were under obligation to make all their purchases from petitioner. A similar fate was met by the Diamond Serum Company, another competitor of petitioner, as disclosed by the findings.

It would require a naive mind to conclude, as petitioner would have us do, that the agreements under consideration could result in other than an adverse effect upon competition. Suppose, for instance, that a salesman for any of petitioner's competitors should attempt to sell to or to obtain an order for sale from any of petitioner's contract holders. Such an attempt would be barren of results because of the customer's obligation to petitioner, and this would be true even though the salesman offered a superior product on more favorable terms. It thus appears plain that the products handled by petitioner's exclusive contract holders are removed from the competitive area.

■ We are not unsympathetic to the suggestion that the section under consideration is capable of producing harsh results, and it is more than possible that the situation before us is a fair example. If such be the case, however, it is the legislative and not the judicial branch of the government from which relief should be sought.

■ Petitioner also raises the issue that the order under review is improperly directed against its "officers, representatives, and employees." Petitioner in support of its contention on this issue cites a decision of this court, R. J. Reynolds Tobacco Co. v. Federal Trade Commission, 7 Cir., 192 F.2d 535. On the contrary, the Commission relies upon Regal Knitwear Co. v. National Labor Relations Board, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661. The order in the Reynolds case was issued pursuant to the Federal Trade Commission Act, which was distinguished from the order of the Labor Board before the court in the Regal Knitwear case, on the ground that the order in the former case was wider in scope than that in the latter because "the unnamed 'officers, agents, repre-

sentatives and employees' are not only subject to a contempt proceeding for the violation of a court's enforcement decree where equitable considerations prevail, but they are likewise subject to a severe penalty, to be recovered in a civil action." 192 F.2d at page 540. The distinction which we made in the Reynolds case, however, cannot be made here because the enforcement of this order is lodged exclusively in the appropriate Court of Appeals by § 11 of the Clayton Act, 15 U.S.C.A. § 21. It is, therefore, our view that the Regal Knitwear case is controlling here.

The petition to set aside respondent's cease and desist order is denied, and an appropriate enforcement decree will be entered upon presentation.