**OXFORD VARNISH CORPORATION et al.
v. AULT & WIBORG CORPORATION.***

No. 7005.

Circuit Court of Appeals, Sixth Circuit.
May 8, 1936.

Samuel E. Darby, Jr., of New York City (Bates, Golrick & Teare and Albert R. Golrick, all of Cleveland, Ohio, on the brief), for appellants.

Edmund P. Wood, of Cincinnati, Ohio (Arthur M. Smith, of Detroit, Mich., and Truman A. Herron and Wood & Wood, all of Cincinnati, Ohio, on the brief), for appellee.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

SIMONS, Circuit Judge.

The appeal challenges the validity of a final decree in an equity suit granting injunctive relief against the appellants under section 16 of the Clayton Act (15 U.S. C.A. § 26), for alleged violations of section 3 of that act (15 U.S.C.A. § 14), and sections 1 and 2 of the Sherman Anti-Trust Act (15 U.S.C.A. §§ 1, 2).

Section 1 of the Sherman Anti-Trust Act declares every contract in restraint of trade or commerce among the states to be illegal. Section 2 imposes a penalty upon every person who shall monopolize or attempt to monopolize any part of the trade or commerce among the several states. Section 3 of the Clayton Act declares it to be unlawful for any person engaged in commerce to lease or make a sale or contract for the sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, "where the effect of such lease, sale, or contract for sale or such condition, ·agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." Section 16 of the Clayton Act gives to private persons, firms, or corporations the right to sue for injunctive relief against threatened loss or damage by a violation of the anti-trust laws, including the sections herein referred to, when and under the same conditions and principles

---

*Rehearing denied — F.(2d) —.

as injunctive relief against threatened loss or damage is granted by courts of equity.

The appellant Oxford Varnish Corporation owns and controls patents for a process of applying to metal or other surfaces a graining simulating the color and appearance of natural wood grains. Chief among these patents is Henry, No. 1,548,-465, which is for a process of making graining plates. The appellant Vance Manufacturing Company is a wholly owned subsidiary of Oxford, still retaining its corporate identity but now dormant. The appellee is a corporation engaged in the manufacture of standard paints, varnishes, lacquer, and the like, and as plaintiff below invoked section 16 of the Clayton Act.

It was Oxford's practice to manufacture the plates and lease them to licensees under its patents upon a royalty based upon the amount of finished product produced by them. The materials used in the graining process consist of a primer, or bottom coat of varnish or paint, a graining ink or paste, and a top or finishing coat. These materials Oxford manufactures, and in its several forms of contract with licensees it included covenants to compel or to make desirable the purchase of its own graining materials. It is the validity of these covenants that the plaintiff assails, on the ground that they substantially lessen competition and tend to create monopoly, to its irreparable damage as a competitor.

Oxford justifies its business practice on the ground that in the use of its patented plates by licensees the materials must be adapted to the requirements of each individual customer; that there is something special in each installation; that to meet this need, encountered at the outset, it organized a technical staff which by experiment and research developed the particular technique and treatment found to be necessary in each operation; that it has developed hundreds of different kinds of graining pastes, ground coats and top coats; that it does not charge its customers for the service, but receives compensation for its development work through the lease of the graining plates and the sale of the materials developed for each particular need; that in any event its business in relation to the total volume of the paint and

varnish business of the country is so infinitesimal that it cannot be said by its practice to substantially lessen competition or tend to create a monopoly, and so does not offend against the statute.

The court found, however, that the plaintiff and others in similar business are able to furnish priming coats, graining pastes, and finishing coats as efficient as those produced by Oxford, accomplishing the same purposes and in no way impairing the usefulness of the patented processes or plates. We are unable to say upon this record that such finding is not supported by preponderance of evidence,[1] and giving it such weight as is usually given to the factual conclusions of the court which hears and sees the witnesses, it is accepted as the basis for considering the legal issues involved.

Four forms of license agreement were employed. The first three are substantially identical. While the wording varies, the licensee in each expressly binds himself to purchase supplies from Oxford exclusively during the term of the agreement. The fourth form is a departure from the others. By it the licensee agrees to pay Oxford a royalty of one cent for each square foot of surface finished by the use of the patented processes, machinery, or equipment, when all materials utilized are purchased from Oxford, but a royalty of three cents for each square foot when it desires to use the patents with material purchased from others. The significance of the increased royalty, aptly designated below as a penalty royalty, is demonstrated by unchallenged evidence to add $2.07 to the cost of each gallon of material used in the licensed process. The court found such penalty to be so prohibitive in its effect as to compel licensees to purchase supplies from Oxford. With this conclusion we must agree, and so agreeing, we find no material difference in the various forms of contract employed. They are either all valid or equally invalid.

It is clearly settled that the limited monopoly granted by a patent to make, use, and vend an article may not be "expanded by limitations as to materials and supplies necessary to the operation of it." Motion Pictures Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 515, 37 S.Ct. 416,

---

[1] Besides, the very existence of the assailed covenants suggests that in their absence competing articles of equal or better quality would be offered at the same or a lower price. Vaughn, Economics of Our Patent System, 125, 127, cited in Carbice Corp. v. Am. Patents Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819.

420, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann. Cas.1918A, 959; Carbice Corp. v. American Patents Corp., 283 U.S. 27, 31, 51 S.Ct. 334, 75 L.Ed. 819; Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 152 U.S. 425, 433, 14 S.Ct. 627, 38 L.Ed. 500; Sturgis Register Co., et al., v. Autographic Register Co., 73 F.(2d) 883, 885 (C.C.A. 6). Cf. Kodel Electric & Mfg. Co. v. Warren, 62 F.(2d) 692 (C.C.A.6). But that which the patent law does not authorize the Clayton Act specifically forbids. It applies to goods, wares, machinery, etc., whether patented or unpatented. "This provision was inserted in the Clayton Act with the express purpose of preventing rights granted by letters patent from securing immunity from the inhibitions of the act." United Shoe Machinery Co. v. United States, 258 U.S. 451, 460, 42 S.Ct. 363, 366, 66 L.Ed. 708; cf. Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653; Lord v. Radio Corp. of America (D.C.) 24 F.(2d) 565, affirmed, 28 F.(2d) 257 (C. C.A.3), cert. denied 278 U.S. 648, 49 S.Ct. 83, 73 L.Ed. 560.[2]

The appellant, however, contends that it may not be brought within the condemnation of the Clayton Act unless the contracts complained of substantially lessen competition or tend to create monopoly, and that the proofs have failed to establish either result, as existing or threatened. The total business of the appellant in graining supplies during 1933 was $325,-000, while the total paint and varnish business of the United States for the same year was over $66,000,000, so it is insisted that accepting the plaintiff's assumption that the defendant's products are standard, its business represents approximately one-half of one per cent. of the total volume of the industry. Obviously, it urges, this is neither monopoly nor the slightest indication of tendency toward monopoly. No case has been found, it insists, where a business has been held monopolistic which did not control at least 40 per cent. of the total business of the industry. Nor may a business of $325,000 be held to substantially lessen competition in an industry with a volume of $66,000,000. While the Supreme Court in cases involving the Clayton Act has upon occasion adverted to the size of the assailed manufacturer or vendor in relation to the business of

the industry, we are aware of no pronouncement that proportions are conclusive. Conceivably a business practice may tend to create monopoly though barely entered upon. Neither the Sherman Anti-Trust Act nor the Clayton Act defines "monopoly," and neither charts the field with respect to which a given practice may be adjudged monopolistic, or be deemed to lessen competition. The patent law recognizes limited monopoly, often in an extremely narrow and restricted field. Manifestly there may be monopoly of a defined subdivision of an industry, as of the industry itself. The possible though impermissible partial monopolies sought by the owner of a patent are clearly pointed out in the Carbice Case, supra.

The ratio borne by the defendant's volume of business to the paint and varnish industry is not, we think, the measure by which monopolistic tendency of its contracts is to be determined. While the plaintiff did not produce figures for the volume of business done in graining pastes and the like because none are available, yet the most ordinary observation must convince us that the volume of business in such materials is but a small fraction of the total business of the paint and varnish industry. But even this is not necessarily the measure by which monopoly or monopolistic tendency is to be measured. The defendant is possessed of patents. Such patents grant it a limited monopoly, limited as to time and as to the articles or processes precisely covered by the claims. Within such limitations its monopoly is exclusive and complete—there is no unoccupied area. It seeks by contract to extend within that restricted field the monopoly of the patent to supplies not covered by patent. The record shows it to have been wholly successful. Competitors may not negotiate with its licensees on an equal trading basis—they are wholly and completely shut out. If we may assume, as we do, that monopoly of a defined portion of an industry is equally subject to the condemnation of the anti-trust laws as is a monopoly over an entire industry, then it requires in this case no statistical demonstration of monopolistic practices, for the patents themselves, which define the metes and bounds of the monopoly lawfully granted, likewise define the metes and bounds of the monopoly here sought and

[2] See International Business Machines Corp. v. U. S., 56 S.Ct. 701, 80 L.Ed. —, decided April 27, 1936.

achieved by the assailed contracts. No more was desired—no less was obtained.

 We are referred by the plaintiff to the recent case of Pick Manufacturing Co. v. General Motors Corp., 80 F.(2d) 641 (C. C.A.7), and the decision therein merits consideration.[3] It is not in conflict with the views here expressed. A manufacturer of motorcars bound its dealers by contract not to use secondhand parts or parts not genuine for replacement in its automobiles. Attack upon the agreements under section 3 of the Clayton Act was unsuccessful. But the manufacturer not only gave express warranties for a period to the dealers' customers, but it was shown that the replacement parts were generally not supplies consumed in operation, but operating parts of a complex mechanism, the origin of which is inevitably attributed to the manufacturer, and the failure of which is inevitably placed at his door, with resulting impairment of good will and damage to the reputation of his product. So the case was distinguished from Lord v. Radio Corp., supra (the radio tube case). A more fundamental distinction between the cases appears to us. The association in the public mind between the manufacturer and the efficient operation of its cars being what it is, even in the absence of misrepresentation, the primary purpose and resultant effect of such contracts are rather to guard against unfair competition than to lessen legitimate competition, or create monopoly, and the clear purpose of the Clayton Act (38 Stat. 730) is to preserve legitimate competition, not to penalize efforts reasonably directed to safeguard against unfair competition. It is the proverbial "shield" of the fair trader, not the "sword" of his unfair competitor. There is in this case no such association of ideas as was found to exist in the General Motors Case. Our conclusion is that the assailed contracts in the respects indicated are invalid, and that the injunction should be sustained.

The decree below likewise enjoins performance of a contract made by the appellant with the A. C. Horn Company, and held invalid under sections 1 and 2 of the Sherman Anti-Trust Act. That company was not a processor, but was given an exclusive territory within which to grant sublicenses to processors. The agreement, however, bound the Horn Company to charge more royalty for the use of the plates by processors who purchased supplies elsewhere than by those who bought from the appellant. Horn was made a defendant in the suit below, but after the commencement of the action modified its course of business, afforded the plaintiff the relief it sought, and suit was dismissed as to Horn without prejudice. Since the record shows only one contract of the Horn character, and no others in contemplation, and since Horn has left the unlawful combination and a single party may not conspire, we think the issues as to the Horn contract have become moot. Insofar as the decree grants injunction against the enforcement of the Horn contract, it will be modified, and as modified,

The decree below is affirmed.

---

[3] See International Business Machines Corp. v. U. S., supra.