**TAMPA ELECTRIC COMPANY,**
Appellant,

v.

**NASHVILLE COAL COMPANY, Nashville Coal, Inc., and West Kentucky Coal Company,** Appellees.

No. 13775.

United States Court of Appeals
Sixth Circuit.

April 4, 1960.

Weick, Circuit Judge, dissented.

William C. Chanler, New York City, (Winthrop, Stimson, Putnam & Roberts, New York City, David M. Keeble of Hooker, Keeble, Dodson & Harris, Nashville, Tenn., on the brief; Edwin J. Wesely, Stephen A. Weiner, New York City, of counsel), for appellant.

Abe Fortas, Washington, D. C. (Norman Diamond of Arnold, Fortas & Porter, Washington, D. C., Cecil Sims of Bass, Berry & Sims, Nashville, Tenn., on the brief), for appellee.

Before MILLER, CECIL and WEICK,* Circuit Judges.

SHACKELFORD MILLER, Jr., Circuit Judge.

The appellant, Tampa Electric Company, brought this declaratory judgment action in the District Court, pursuant to Sec. 2201, Title 28 U.S.C., for the purpose of having its contract of May 23, 1955, providing for the purchase of coal by it from the appellees, declared valid and enforceable. The appellees contended that the contract was illegal and unenforceable by or against either of the contracting parties, in that it was contrary to Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, Sections 1, 2 and 14, Title 15 U.S.C.A. The facts not being in dispute, both the appellant and the appellees moved for summary judgment. The District Judge held that the contract was in violation of Section 3 of the Clayton Act, was therefore illegal and unenforceable, and that the appellant was entitled to no relief against any of the appellees on account of their refusal to perform under the contract. Tampa Electric Co. v. Nashville Coal Co., D.C. M.D.Tenn., 168 F.Supp. 456. This appeal followed.

Appellant is an electric public utility serving the city of Tampa, Florida, and neighboring communities. The appellees are engaged in mining and selling coal.

In 1954 appellant operated two integrated generating plants, both located on Tampa Bay, Florida, at which there were eleven generating units, all of which burned oil. In that year, in order to meet the increasing demand for electric energy in its service area, appellant decided to expand its facilities and build a new and additional integrated generating station on Tampa Bay, to be known as the Francis J. Gannon Station, at which it was planned to ultimately install six generating units.

---

* On the day of the oral argument of the case in this Court, Judge Weick was a District Judge sitting by designation. He was sworn in as Circuit Judge on the following day.

The May 23, 1955, contract was for the purchase of coal for use at the Gannon Station. It was entered into between the appellant as the buyer and the Potter Towing Company, a Tennessee partnership of David K. Wilson and Justin Potter, as the seller. Subsequent to the making of the contract, the interest of Wilson and Potter was transferred to the appellee Nashville Coal Co. and thereafter to the appellee Nashville Coal, Inc., which is a wholly owned subsidiary of the appellee West Kentucky Coal Company. The West Kentucky Coal Company guaranteed the appellant in writing against any loss or damage arising out of nonperformance of the contract.

The contract, after stating that the seller proposed to make available for sale to the buyer large quantities of coal from the West Kentucky field near Uniontown, Kentucky, and that the buyer desired to purchase certain coal for its use in its plant to be constructed near Tampa, upon the terms and conditions thereinafter set out, provided as follows:

"Seller agrees to provide and deliver on the dock or docks of the Buyer at Plant Gannon coal to supply the total requirements of fuel of the Buyer for the operation of its first two units to be installed at the Gannon Station and the Buyer agrees to accept and pay for such fuel as provided in Article 4 hereof, which fuel requirements shall be not less than 225,000 tons of coal per unit per year. It is further agreed that if during the first 10 years of the term of this contract the Buyer constructs additional units in which coal is used as the fuel, it shall give the Seller notice thereof two years prior to the completion of such unit or units and upon completion of same the fuel requirements thereof shall be added to this contract and be furnished by the Seller and accepted by the Buyer. It is understood that the Buyer has the option to be exercised two years prior to completion of said unit or units of determining whether coal or some

other fuel shall be used in same. It is anticipated that deliveries will start approximately March, 1957 for the requirements of the first unit and that deliveries for the requirements of Unit #2 will begin when constructed."

It also provided,

"The term of this agreement shall be for a period of twenty years from the first day of the month in which month first deliveries are made to the Buyer."

The first unit of the Gannon plant commenced operation August 1, 1957; the second unit on October 29, 1958. The third unit, a coal burning unit, was under construction at the time this action was filed.

For the appellant to equip the Gannon Station to burn coal necessitated a capital expenditure of $3,000,000.00 more than if the fuel initially chosen had been oil. To supply the appellant under this contract required a capital expenditure in excess of $7,500,000.00 by the appellees.

In April, 1957, just before the first coal was to be delivered under the contract, the appellees advised appellant that they would not perform under the contract, which they contended was illegal and unenforceable by either party. As a result, it has been necessary for appellant to purchase its coal requirements in the market at a price substantially higher than that provided for in the contract.

In making such arrangements it estimated that its coal requirements for its Gannon Station were approximately as follows:

| | |
|---|---|
| Year 1958 .......... | 350,000 tons |
| Year 1959 .......... | 700,000 tons |
| Year 1960 .......... | 700,000 tons |
| Year 1961 ..........| 1,000,000 tons |

"To increase as required to about 2,250,-000 tons per year."

At the time the contract was entered into, coal accounted for less than 6% of the fuel consumed in the entire state of Florida. Every electric generating in-

stallation in peninsular Florida burned oil at that time. It was estimated by the buyer that within a very few years the Gannon Station would consume more coal than was presently consumed in the entire state of Florida. Peninsular Florida's coal consumption was approximately 700,000 tons per year.

Section 3 of the Clayton Act provides as follows:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to * * * contract for sale of goods, * * *, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States * * *, on the condition, agreement, or understanding that the * * * purchaser thereof shall not use or deal in the goods, * * *, supplies, or other commodities of a competitor or competitors of the * * * seller, where the effect of such * * * contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

■ Appellant's initial contention is that the statutory history of Section 3 shows that the Act was not intended to apply to consumers; that it was intended solely for the purpose of protecting dealers and retailers from certain specific practices whereby powerful sellers, through some form of economic leverage, frequently required them to execute agreements not to deal in a competitor's goods as a condition to the purchase of the seller's goods; and that Congress never contemplated that the Act should prevent a consumer from contracting for the purchase of his requirements of a single commodity, even though the amount was very substantial. In other words, Congress was concerned only with attempts by sellers, who were economically powerful, to restrain competition in the distributive process. The statutory language is not so restrictive. It expressly refers to "a" contract for sale

"for *use*, consumption or resale." (Emphasis added.) The wording clearly includes a single sales contract for *use or consumption,* as well as multiple sales by sellers to numerous dealers or retailers for resale. There is nothing ambiguous about this language of the statute. Under such circumstances, we do not look to the legislative history of the Act in order to give it a different construction. In Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 42 S.Ct. 360, 362, 66 L.Ed. 653, the Court had under consideration the construction of Section 3 of the Clayton Act. The Court said, "Much is said in the briefs concerning the reports of committees concerned with the enactment of this legislation, but the words of the act are plain and their meaning is apparent, without the necessity of resorting to the extraneous statements and often unsatisfactory aid of such reports." To the same effect is Anchor Serum Co. v. Federal Trade Commission, 7 Cir., 217 F.2d 867, 870; George Van Camp & Sons v. American Can Co., 278 U.S. 245, 253–254, 49 S.Ct. 112, 73 L.Ed. 311. See also: Ohio Power Co. v. N. L. R. B., 6 Cir., 176 F.2d 385, 387, 11 A.L.R.2d 243, certiorari denied 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553; Mid-Continent Petroleum Corp. v. N. L. R. B., 6 Cir., 204 F.2d 613, 623, certiorari denied, 346 U.S. 856, 74 S.Ct. 71, 98 L.Ed. 369.

The statute condemns certain transactions, the effect of which may be to substantially lessen competition or tend to create a monopoly in any line of commerce. A single contract of sale of sufficient magnitude, with performance extending over an extended period of time, can cause this result. If it does have this result and is otherwise included within the plain wording of the statute, the statute must be construed in accordance with the Congressional purpose. Securities & Exchange Commission v. C. M. Joiner Leasing Corp., 320 U.S. 344, 350–351, 64 S.Ct. 120, 88 L.Ed. 88; Cornett-Lewis Coal Co. v. Commissioner, 6 Cir., 141 F.2d 1000, 1004. In Standard Oil Co. of California v. United States, 337

U.S. 293, 302–305, 69 S.Ct. 1051, 93 L.Ed. 1371, the Supreme Court held Section 3 of the Act applicable to a situation where the seller did not occupy a dominant economic position in the industry.

■ Appellant contends that the contract of sale was not entered into "on the condition, agreement, or understanding" that the appellant would not use or deal in the goods of a competitor, which is necessary in order for the statute to be applicable. Concededly, the contract is a "requirements" contract and does not expressly contain the "condition" required by the statute. But, the contract provides for the appellees to supply the appellant its "total requirements" for the first two coal burning units and for such other units at the Gannon Station as would be constructed as coal burning units. The actual result of this contract is to prevent the purchaser from buying any coal for those units from a competitor of the appellees. We agree with the ruling of the District Judge that the contract is one within the sense and meaning of Section 3 of the Clayton Act, in that it requires the buyer not to use or deal in the goods of a competitor of the seller, irrespective of the absence of the specific words contained in the statute. In Standard Oil Co. of California v. United States, supra, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, and Anchor Serum Co. v. Federal Trade Commission, supra, 7 Cir., 217 F.2d 867, the contracts therein declared illegal were "requirements" contracts, which did not contain the unlawful condition in *haec verba*.

■ The foregoing ruling does not mean that "requirements" contracts are illegal per se. As pointed out in Standard Oil Co. of California v. United States, supra, 337 U.S. 293, 306–307, 69 S.Ct. 1051, 93 L.Ed. 1371, "requirements" contracts may well be of economic advantage to buyers as well as to sellers. The effect of the particular contract under the circumstances of the case is the determining factor. A "requirements" contract of some companies over a short period of time might well avoid the effect

proscribed by the statute, while such a contract of large proportions and extending over a long period of years would clearly fall within the provisions of the statute. United States v. Linde Air Products Co., D.C.N.D.Ill., 83 F.Supp. 978, 982; United States v. American Can Co., D.C.N.D.Cal., 87 F.Supp. 18, 31–32.

There is also an important difference between a "requirements" contract and a contract which calls for the purchase of a definite quantity over a period of time which the buyer estimates to be sufficient to meet his requirements. As pointed out in United States v. Standard Oil Co., D.C.S.D.Cal., 78 F.Supp. 850, 867, when a dealer agrees to take a specific amount of a product, there is a likelihood that he may, by reason of unexpected shortages or increased demands, use competitive products, and competitors thus will have the opportunity of putting their products into competitive use by the buyer, with the ultimate result of inducing the buyer to handle their products. Under a "requirements" contract for a long period of time this chance is, for all practical purposes, cut off. As stated by the Supreme Court in Standard Oil Co. of California v. United States, supra, 337 U.S. 293, 314, 69 S.Ct. 1051, 1062, 93 L.Ed. 1371, "It cannot be gainsaid that observance by a dealer of his requirements contract with Standard does effectively foreclose whatever opportunity there might be for competing suppliers to attract his patronage, * * *."

■ Appellant makes the further contention that Section 3 is not applicable because the contract does not prohibit it from dealing in the goods of a competitor, as required by the Act. It is argued that coal and oil are competitive fuels, that the contract deals only with the purchase of coal, and that the appellant, as is permitted by the contract, buys oil from various suppliers for its non-coal burning units. It is also pointed out that there is the possibility that existing oil burning units could be converted to coal or that additional coal

burning units, not covered by the contract, could be constructed, the coal for which could be purchased from any of appellees' competitors. The argument is a plausible one, but we believe it completely ignores the realities of the situation.

It is true that coal and oil are competitive fuels. West Ohio Gas Co. v. Public Utilities Commission, 294 U.S. 63, 72, 55 S.Ct. 316, 79 L.Ed. 761. But, for the purposes of Section 3 of the Clayton Act, we believe that each is to be treated as a separate, defined subdivision of the fuel industry generally. George Van Camp & Sons v. American Can Co., supra, 278 U.S. 245, 253, 49 S.Ct. 112, 73 L.Ed. 311; United States v. E. I. duPont de Nemours & Co., 353 U.S. 586, 593–594, 77 S.Ct. 872, 1 L.Ed.2d 1057; Oxford Varnish Corp. v. Ault & Wiborg Corp., 6 Cir., 83 F.2d 764, 766. The present contract deals with coal and coal burning units only, and we treat as irrevelant appellant's purchases of oil for its oil burning units in an entirely separate plant at a different location.

At the time the contract was made, there were no coal burning units not covered by the contract. There is nothing to indicate that there is any planned or probable conversion of oil burning units into coal burning units or construction of coal burning units not covered by the contract. The contract requires the appellant to purchase all of its present, and its planned future, requirements of coal from a single seller. We agree with the ruling of the District Judge that the question must be decided upon the basis of realities and the contract construed reasonably in the light of existing facts. The remote possibility that a buyer might use a competitor's product is an immaterial factor in the actual picture before the Court. United States v. International Salt Co., D.C.S.D. N.Y., 6 F.R.D. 302, 307, affirmed 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; Northern Pacific Railway Co. v. United States, 356 U.S. 1, 10, footnote 8, 78 S.Ct. 514, 2 L.Ed.2d 545; Judson L. Thomson Mfg. Co. v. Federal Trade Commission, 1 Cir., 150 F.2d 952, certiorari denied, 326 U.S. 776, 66 S.Ct. 267, 90 L.Ed. 469; Signode Steel Strapping Co. v. Federal Trade Commission, 4 Cir., 132 F.2d 48.

As appellant contends, it is not sufficient that the "requirements" contract is one which in substance prohibits the purchaser from dealing in the goods of a competitor of the seller. Under Section 3 such a contract is not invalid unless its effect "may be to substantially lessen competition or tend to create a monopoly in any line of commerce." In International Salt Co. v. United States, supra, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20, the Court ruled that where the volume of business affected by the contract cannot be said to be insignificant or insubstantial the tendency of the arrangement to accomplishment of monopoly seems obvious, pointing out that it is immaterial that the tendency is a creeping one rather than one that proceeds at full gallop. In Standard Oil Co. of California v. United States, supra, 337 U.S. 293, 314, 69 S.Ct. 1051, 93 L.Ed. 1371, the Court held that the qualifying clause of Section 3 is satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected and that it was the purpose of Section 3 to remove a potential clog on competition wherever, were it to become actual, it would impede a substantial amount of competitive activity. Applying this standard to the present case there is no question but that the effect of the contract will be to substantially lessen competition. At the estimated 1959 rate of consumption, namely 700,000 tons per year, it would about equal peninsular Florida's annual coal consumption prior to the execution of the contract. Using the estimated 1,000,000 tons for 1961 as the average annual purchases during the twenty year life of the contract, the total dollar pre-emption over the life of the contract at the minimum price of $6.40 per ton would amount to $128,000,000.00. This is, of course, not insignificant or insubstantial.

■ Nor is the case removed from the operation of the Act by the fact that the contract would have overall beneficial results in starting the substantial use of coal in peninsular Florida and thus afford substantial competition to the use of oil. The possible benefits that may result from one particular contract, by reason of the special circumstances applicable to it, cannot override the general policy of the Act prohibiting transactions which tend to create a monopoly in any line of commerce. Pennsylvania Water & Power Co. v. Consolidated Gas, Electric Light & Power Co., 4 Cir., 184 F.2d 552, 559, certiorari denied, 340 U.S. 906, 71 S.Ct. 282, 95 L.Ed. 655; Standard Oil Co. of California v. United States, supra, 337 U.S. 293, 311–312, 69 S.Ct. 1051, 93 L.Ed. 1371.

■ Although the contract is in violation of the statute and therefore illegal, appellant contends that the appellees should not be allowed to take advantage of their own illegal act to relieve themselves of a contract obligation which now appears burdensome. Appellant recognizes the well settled general rule that a court will not lend its assistance in any way towards carrying out the terms of an illegal contract. McMullen v. Hoffman, 174 U.S. 639, 654, 19 S.Ct. 839, 43 L.Ed. 1117; E. E. Taenzer & Co. v. Chicago, R. I. & P. Ry. Co., 6 Cir., 191 F. 543, 550; National Transformer Corp. v. France Mfg. Co., 6 Cir., 215 F.2d 343, 361. But, it urges upon us a well recognized exception to this general rule that if the parties are not in *pari delicto* and the undertakings of each are not equally blameworthy, a court of equity may, in furtherance of justice and of a sound public policy, aid the one who is comparatively the more innocent. Marshall v. Lovell, 8 Cir., 19 F.2d 751, 753–754, quoting from Pomeroy's Equity Jurisprudence, 4 Ed., Section 942; Restatement, Contracts, Section 601; 6 Corbin, Contracts, Section 1540 (1951); Ring v. Spina, 2 Cir., 148 F.2d 647, 653; Allgair v. Glenmore Distilleries Co., D.C. S.D.N.Y., 91 F.Supp. 93, 95–96; Hartford-Empire Co. v. Glenshaw Glass Co.,

D.C.W.D.Pa., 47 F.Supp. 711, 717. Appellant points out that Section 3 of the Clayton Act is directed against the seller; its purpose is to protect the buyer; and that the case falls within the exception.

■ We think that our decision on this issue is controlled by the recent analysis of the problem by the Supreme Court in Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475. In that case the Court rejected the defense of illegality in an action under a contract which violated the Sherman Anti-Trust Act, but pointed out that in a restricted class of cases the defense was a valid one. If the contract is of such a nature that a part of it constitutes an intelligible economic transaction in itself and the enforcement of that portion of the contract would not be to enforce a violation of the Act, then such portion of the contract will be enforced in order to avoid an inequitable result. But, the Court will not enforce a contract which is illegal under the anti-trust laws of the United States if, in doing so, the Court would be a party to carrying out of one of the very restraints forbidden by the Act. Kelly v. Kosuga, supra, 358 U.S. at page 520, 79 S.Ct. 429; Continental Wall Paper Co. v. Louis Voigt & Sons Co., 212 U.S. 227, 261–263, 29 S.Ct. 280, 53 L.Ed. 486. It is immaterial whether the contract was for the benefit of the seller or the buyer. The determining factor is whether the result of the contract had the proscribed effect and this is so, even though the result is a harsh one for one of the parties. Anchor Serum Co. v. Federal Trade Commission, supra, 7 Cir., 217 F.2d 867, 870, 873. The aid of the Court is denied not for the benefit of either of the parties, but because public policy demands that it should be denied without regard to the interests of individual parties. Continental Wall Paper Co. v. Louis Voigt & Sons Co., supra, 212 U.S. 227, 262, 29 S.Ct. 280, 53 L.Ed. 486.

■ The contract in the present case is an executory one. It is not at the

present time divisible into an executed portion and an executory portion so as to permit recovery for any portion which may have been performed without ordering a violation of the Act in the future. The appellant is seeking to have declared valid the very provisions which make it invalid. To do so would be to compel the parties to engage in business with each other over a period of twenty years in a manner which the Act declares invalid. The recent decision of the Court of Appeals for the Seventh Circuit in Beloit Culligan Soft Water Service, Inc. v. Culligan, Inc., 274 F.2d 29, December 15, 1959, rehearing denied January 12, 1960, is, we believe, distinguishable for the same reasons. Under such circumstances, the Court will not assist either party in its enforcement.

This view of the case makes it unnecessary to consider the effect of Sections 1 and 2 of the Sherman Act.

The judgment is affirmed.

WEICK, Circuit Judge (dissenting).

It is with reluctance that I have filed this dissenting opinion, particularly in view of the careful consideration which this case has received by the majority and by the District Judge. With deference to my colleagues, whose views I respect, I am of the opinion that the authorities on which they relied, when applied to the facts of this case, do not compel the decision which they reached. I think the judgment below has produced a harsh result, not in the contemplation of the Clayton Act, which is being enforced against the wrong party.

The seller [1] has successfully avoided its contractual obligations with the defense that in making the contract of sale it violated the anti-trust laws, § 3 of the Clayton Act (Title 15 U.S.C.A. § 14). While this defense has been frequently resorted to by buyers in attempting to avoid payment of their indebtedness to sellers, it is, I submit, somewhat unusual for a seller to plead its own violation of the anti-trust laws in asking a court to relieve it of its contractual obligations, particularly since these laws were aimed at sellers and not buyers.

The type of defense availed of here by the seller has not met with favor by the Supreme Court when invoked by a buyer. Kelly v. Kosuga, 1959, 358 U.S. 516, 518, 79 S.Ct. 429, 3 L.Ed.2d 475; Bruce's Juices, Inc. v. American Can Co., 1947, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219; Wilder Mfg. Co. v. Corn Products Refining Co., 1915, 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520; 42 University of Virginia Law Review 785.

In enacting the anti-trust laws Congress created a right and prescribed a remedy. The remedy of private parties injured by reason of violation of the anti-trust laws is an action for treble damages [2] and injunction.[3] There are also enforcement provisions for injunctive relief in actions by the Federal Trade Commission [4] and the United States.[5]

The remedy provided private parties would seem to be adequate, namely, the recovery of treble damages and an injunction to stop the illegal practices. In any event, the statutory remedy is all that Congress provided. Congress could have vitiated contracts made in violation of the Clayton Act. It did not do so.

The provisions of the Clayton Act are materially different from Section 1 of the Sherman Act. The Sherman Act is directed to "every contract * * * in restraint of trade or commerce * * * is declared to be illegal." 15 U.S.C.A. § 1. The Clayton Act is directed against the person. It provides: " * * * It shall be unlawful for any person * * * to * * * contract for sale of goods * * * " Criminal sanctions are imposed for violation of the Sherman Act,

1. For the purposes of this opinion appellant will be referred to as Tampa or buyer and appellee as seller.

2. Title 15 U.S.C.A. § 15.

3. Title 15 U.S.C.A. § 26.

4. Title 15 U.S.C.A. § 21.

5. Title 15 U.S.C.A. § 25.

but not for violation of the Clayton Act.[6]

Appellee successfully argued in the District Court that the legislative history of the Clayton Act should be ignored, on the authority of Standard Fashion Co. v. Magrane-Houston Co., 1922, 258 U.S. 346, 356, 42 S.Ct. 360, 66 L.Ed. 653.

While it may have been crystal clear in Standard Fashion that the contract there involved was a violation of the Clayton Act, I feel that it is not so apparent when applied to the contract here. The legislative history is important because it aids in the interpretation of the statute and reveals that Congress never intended the law to be applied to such a case as the one at bar.

In Harrison v. Northern Trust Co., 1943, 317 U.S. 476, 479, 63 S.Ct. 361, 363, 87 L.Ed. 407, the Court said:

> "But words are inexact tools at best and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how 'clear the words may appear on "superficial examination." ' "

Mr. Justice Holmes, in Towne v. Eisner, 1918, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372, said:

> "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances in which it is used."

It has been well stated:

> The records of legislative assemblies once opened and read with a knowledge of legislative procedure often reveal the richest kind of evidence * * * Legislative history similarly affords in many instances accurate and compelling guides to legislative meaning * * * To ignore legislative processes and legislative history in the processes of interpretation, is to turn one's back on whatever history

may reveal as to the direction of the political and economic forces of our time. Landis, A Note on Statutory Interpretation. 43 Harvard L.Review, 886, 888, 889, 892.

The evils sought to be remedied by the Clayton Act were set out in the reports of the Congressional committees, in the hearings before the committees and in the debates.[7]

The evils were declared to be exclusive or tying contracts made between manufacturer and dealer whereby the latter specifically agreed not to deal in the commodities of the seller's competitors and contracts tying non-patented articles to the sale of patented articles.

The legislative proceedings are all too clear that what Congress was aiming at was monopolistic practices of powerful sellers in the distribution of goods whereby the dealer or buyer was prohibited from dealing in the goods of the seller's competitors. The legislation was directed against sellers, not buyers, and was intended to curtail the monopolistic practices of the commercial and industrial giants of the day.

At the same time, the need was recognized for more effective legal relief to private parties injured by violation of the anti-trust laws. Private parties threatened by loss or damage from violation of the law were given the right to injunctive relief, and treble damage actions were facilitated by making judgment in a Government suit or prosecution prima facie evidence of the violation there established. Despite these efforts to aid private parties, no action was taken to incorporate the provisions of pending bills which would have authorized broad application of the defense that the plaintiff in a civil action had violated the anti-trust laws. Lockhart, Violation of the Anti-trust Laws as a Defense in Civil Actions, 31 Minn.L.R. 507, 551.

6. The bill as it passed the House of Representatives contained criminal sanctions. These were eliminated in the Senate.

7. H.R.Rep. No. 627, 63rd Cong., 2nd Session (May 6, 1914); S. Report No. 698, 63rd Cong. 2nd Session (July 22, 1914); 51 Cong.Rec. 9406, 9407, 9160, 14226, 14270.

Annexation of the illegality defense to the statute by implication either as an inference of unexpressed intention of Congress or as the result of some doctrine of common law, would be justified only if it would be at least a rational, nondiscriminatory and appropriate means of making the policy of the statute effective. Cf. Bruce's Juices v. American Can Co., 1947, 330 U.S. 743, 752, 67 S.Ct. 1015, 91 L.Ed. 1219.

The buyer was a privately owned public utility engaged in the production and sale of electricity. It served the City of Tampa and surrounding communities. It operated under franchise from the State of Florida and was regulated by public authority. Its rates were fixed by the Public Utility Commission of Florida. It was a monopoly operating under legal sanction.

While this did not give Tampa license to violate the anti-trust laws, Pennsylvania Water & Power Co. v. Consolidated Gas, Electric Light & Power Co., 4 Cir., 1950, 184 F.2d 552, certiorari denied 1950, 340 U.S. 906, 71 S.Ct. 282, 95 L. Ed. 655, nevertheless, its needs and requirements as a regulated public utility, which were materially different from those of private industry, are factors that must be considered in determining the propriety of the contract in the present case. As was stated by the Court of Appeals for the District of Columbia in Pennsylvania Water & Power Company v. Federal Trade Commission, 1951, 89 U.S.App.D.C. 235, 193 F.2d 230, 234, affirmed 1952, 343 U.S. 414, 72 S.Ct. 843, 96 L.Ed. 1042, "the anti-trust laws can have only limited application to industries regulated by specific statutes." The Court observed that laws aimed at combatting monopolistic practices must be applied somewhat differently to those industries which are of themselves monopolies because of public grant, the exigencies of nature, or legislative preference for a particular way of doing business.

The buyer was under obligation to the public to furnish a continuous supply of electricity at rates fixed by the public utilities commission. To meet these obligations it was not only desirable, but absolutely necessary that it be supplied with the boiler fuel to make the electricity. Its rates could not be fixed for any appreciable length of time if it were required to depend upon a fluctuating market price for boiler fuel. It would certainly not be in the public interest to require a utility to purchase boiler fuel on short term contracts or on the open market so that every time there was a shift in the market price, the utility's rates to the public would have to be adjusted.

It is fairly inferable from the record that a rise in the market price of coal took place subsequent to the date of the contract and prior to the time for commencement of deliveries thereunder because, after the seller's repudiation, the buyer had to pay a substantially higher price than the contract price for its requirements of coal. The contract, however, contained an "escalator clause" to take effect upon the commencement of the contract in 1957 providing for adjustments based on the average weekly gross earnings of production workers in manufacturing industry.

The fact that the buyer was required to pay a substantially higher price for coal after the seller's repudiation demonstrates the wisdom of having an enforceable contract. Having such a contract would not only fix the price of coal, but also ensure the continuity of supply. In order to take care of the requirements of its customers, which undoubtedly involved seasonal low and peak loads, a requirements contract seemed best adapted for Tampa's needs. The contract contained a provision for adjustment of any gross inequity that could result from the economic conditions not contemplated by the parties, which was to be corrected by agreement or arbitration.

In the case of Twin City Pipe Line Co. v. Harding Glass Co., 1931, 283 U.S. 353, 51 S.Ct. 476, 75 L.Ed. 1112, the contract in suit called for the largest consumer of gas in Fort Smith, Arkansas to take all its requirements from one company, which amounted to a million to a million

and a half cubic feet per day. The pipe line company sued for specific performance of the contract. The contract in question had no time limit, but the consumer did have the option to purchase other gas if the gas company could not deliver an adequate supply. Although the defense interposed was that the contract was contrary to the public policy and laws of Arkansas, the considerations involved were that the contract was illegal because "it [was] in restraint of trade, tends to the monopolization at Ft. Smith of the sale of gas by the pipe line company, and is an undue restraint of business competition between companies supplying gas." 39 F.2d 408, 409. The Court of Appeals held the contract to be illegal. 8 Cir., 39 F.2d 408. The Supreme Court reversed, and entered judgment for the plaintiff. In so doing the Court stated:

"* * * The contract does not subject the glass company to, or tend in any manner to impose upon the public, any wrong, disadvantage, or evil attributable to monopoly or restraint of trade.

"The glass company has failed to show that the contract has any tendency to injure the public, and no reason appears why it should not be enforced according to its terms." 283 U.S. 353, 358, 51 S.Ct. 476, 478, 75 L.Ed. 1112.

In the case of In the Matter of Houston Texas Gas & Oil Corp., 16 F.P.C. 118 (1956), the Federal Power Commission approved a 20 year requirements contract under which gas would be brought into Florida to compete with oil. Its approval was conditioned on elimination of cancellation provisions. The Court of Appeals affirmed in Florida Economic Advisory Council v. Federal Power Commission, 1957, 102 U.S.App.D.C. 152, 251 F.2d 643, certiorari denied 1958, 356 U.S. 959, 78 S.Ct. 996, 2 L.Ed.2d 1066 stating: "* * * The 'injury' to petitioner [the oil concerns] is that it must share what has heretofore amounted to a power monopoly," id., 251 F.2d at page 649. Cf. United Gas Pipe Line Co. v. Mobile Gas Service Corp., 1956, 350 U.S. 332, 76 S. Ct. 373, 100 L.Ed. 373.

The long term of this contract (20 years) and the fact that over the years it involved a large amount of coal were factors taken into account by the majority in holding it illegal. The business of the buyer required it to use large quantities of boiler fuel. Yet as compared with oil, only two units were using coal whereas eleven units were burning oil.

Prior to the seller's repudiation of the contract, Tampa, in reliance on the contract, had made a capital expenditure of $3,000,000 more than would have been required for oil burning equipment. The seller had also expended $7,500,000 in order to place itself in position to perform the contract. It is, of course, unfortunate for both parties that the seller did not discover that it had violated the law until after these large capital expenditures had been made. Assuming that each entered into the contract with the profit motive in mind, I do not think that 20 years was an unreasonable length of time in which to amortize, out of profits, these large capital expenditures.

It is my firm conviction that, read in the light of its legislative history, the Clayton Act was never intended to vitiate a requirements contract made by a single public utility to ensure a continuing supply of boiler fuels at a constant price. Such a contract is not only an economic necessity in circumstances such as these, but also serves the best interest of the public, who in the long run must shoulder the burden of increased costs of the utility. The holding in the Twin City case, supra, and the insistence upon such a contract by an agency of the United States in the Houston Texas Gas & Oil proceedings, supra, only serves to substantiate that opinion.

Even if the view is taken that the Clayton Act is applicable to the contract in suit, I feel that no violation thereof has been established.

In order for the contract of sale to violate the Clayton Act two elements

must be proven. First, that the contract was "*on the condition, agreement, or understanding* that the * * * purchaser * * * shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor * * * of * * * seller." Second, the effect must be to substantially lessen competition or create a monopoly in any line of commerce.[8] (Emphasis added.)

No such condition was embodied in the written contract either expressly or by fair implication. All that the contract provided was for the supply of the buyer's total requirements *for the first two coal burning units* to be installed at the Gannon Station and for any others built there *during the first ten years* of the contract. Eleven existing units were burning oil. The buyer was free to convert all of its oil burning units to coal burning units and purchase its coal therefor from anyone it chose. Such possible conversion is not as remote as was claimed. In an affidavit of Tampa's president, it is stated that conversion of other units is presently being considered. The buyer was also free to erect new coal burning units at any place other than at Gannon Station, and after ten years at the Gannon Station, and buy its coal from any one. The buyer also had the option at the Gannon Station to reduce the quantity of coal by 15% if it desired to use the by-product of a local supplier.

Since the contract contained no such condition, agreement or understanding as the Clayton Act proscribes, the Act had no application to the present case. But the seller claims that any "requirements" contract comes within the purview of the Clayton Act. I do not agree. A requirements contract could not come within the scope of the Act unless in effect it prohibited the buyer from dealing in the goods of any one else and operated substantially to lessen competition or create a monopoly. If the contract was to purchase only part of the buyer's requirements and he is free to purchase the remainder elsewhere, no violation of the statute occurs.

Looking at the actualities of the case, the buyer was not a dealer in coal or oil. It consumed both in making electricity which it sold to the public. In the very real sense, coal and oil were competitive fuels and the buyer was using both. Eleven of its units were oil burning and only two were to be coal burning. Prior to the construction of the coal burning units at its Gannon Station the buyer used only oil. In fact, on account of the contract in question coal for the first time broke into the Florida utility market which theretofore had been heavily blanketed by large oil companies.

The fact that the contract provided for the buyer's requirements at the two units of the Gannon Station did not bring the contract within the scope of the Clayton Act because it did not foreclose the buyer from using coal in other plants or dealing with the seller's competitors elsewhere.

It must be remembered that at the time of the contract the Gannon Station had not been erected. The contract provided for something to be done in the future. It did not limit Tampa in converting or constructing other coal units anywhere or purchasing coal from anyone except for use at the Gannon Station. The buyer had no interest in creating a monopoly of coal in the seller.

But even if the contract could be construed as requiring the buyer to take all its requirements of coal from seller, under the facts and circumstances of this case, there was no violation of the law.

Of importance in this regard is the holding that, in the circumstances of this case, coal constitutes a "line of commerce." The coal was purchased by Tampa as a source of power for its generators, not for resale to ultimate consumers. It was to be used as a boiler fuel.

The record shows that the Atomic Energy Commission has approved the

8. Title 15 U.S.C.A. § 14.

application of Tampa to build an atomic reactor. It is planned that electricity generated from fissionable fuel will be on its lines by 1964. In order to induce Tampa not to convert its other boilers from oil to coal the oil companies have offered to reduce the price of oil.

It is my conviction that the line of commerce in which these parties were dealing was boiler fuels, not just coal. If the line of commerce is boiler fuel generally, then this contract could not come within the purview of Section 3 of the Clayton Act, as Tampa was certainly free to purchase boiler fuels, other than coal, from whoever it chose.

The standard to be applied in determining what constitutes a line of commerce is derived from three recent Supreme Court decisions, International Boxing Club v. United States, 1959, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270; United States v. E. I. du Pont de Nemours & Co., 1957, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057, and United States v. E. I. du Pont de Nemours & Co., 1956, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264.

In the International Boxing Club case the question presented was whether championship boxing contests were distinct from all professional boxing events. The Supreme Court held they were.

In the 1957 du Pont case the question presented was whether automotive fabrics and finishes were distinct from all other fabrics and finishes. The Supreme Court held they were.

In the 1956 du Pont case the question presented was whether cellophane was distinct from all other flexible packaging materials. The Supreme Court held it was not.

In each of those cases the test applied was constant, while the results differed. The test was enunciated in the du Pont cellophane decision (351 U.S. 377, 76 S. Ct. 994, 100 L.Ed. 1264):

"Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another" (351 U.S. at page 393, 76 S.Ct. at page 1006.)

What is called for is an appraisal of the "cross-elasticity" of demand in the trade. See Note, 54 Col.L.Rev. 580.

"The varying circumstances of each case determine the result. In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce', monopolization of which may be illegal." (351 U.S. at pages 394–5, 76 S.Ct. at page 1007.)

"An element for consideration as to cross-elasticity of demand between products is the responsiveness of the sales of one product to price changes of the other." (351 U.S. at page 400, 76 S.Ct. 994, 1010.)

"The 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." (351 U.S. at page 404, 76 S.Ct. at page 1012.)

With the basic criteria in mind, the three decisions are easily reconciled. As was developed in extensive findings of fact in the du Pont cellophane case, a variety of products are wrapped in both cellophane and several other flexible packaging materials. More simply, a loaf of bread can be wrapped with equal facility in cellophane, wax paper, etc. They are interchangeable. On the other hand, a car cannot be painted with house paint and vice versa. Hence, the result in the 1957 du Pont *litigation*. As to the International Boxing Club decision, the Court found that, in public appeal, cham-

pionship fights exert a different drawing power than do other boxing matches. The decaying status of professional boxing in the United States attests to that fact, as it is only the occasional "glamour" fight which is able to create even a ripple of public enthusiasm.

It is interesting to note though, that in each of the decisions the line of commerce was of such scope as to include sub-divisions within it. The general classification of championship fights covers bouts in each weight class; automotive finishes and fabrics have many variations; the diversity of flexible packaging materials considered is clearly seen in the Court's opinion in the du Pont cellophane case.

An excellent analysis of the proper application of the "line of commerce" test is found in United States v. Guerlain, Inc., D.C.S.D.N.Y., 1957, 155 F.Supp. 77, 85, probable jurs. noted 355 U.S. 937, 951, 78 S.Ct. 429, 544, 2 L.Ed.2d 420, 527, judgments vacated for consideration of United States' motion to dismiss 1958, Parfume Corday, Inc., v. United States, 358 U.S. 915, 79 S.Ct. 286, 3 L.Ed.2d 236. In that action it was alleged that certain French manufacturers and American distributors of perfumes had registered the trade-marks of various perfumes in the name of the American distributors in order to monopolize the American market for those brands. The Court heard evidence that many perfume manufacturers were able to virtually duplicate the fragrances of their competitors and that the average person would not distinguish between the two scents. On the other hand, it was shown that in fact the most important element in successful marketing of name brand perfumes is the establishment of a demand for the name, rather than the odor. The Court concluded:

"Objectively, the products may be more than reasonably interchangeable with others. But the lack of objectivity in consumer demand impairs the basis of interchangeability and negates a finding of cross-elasticity."

The Court distinguished that situation, wherein consumer demand is for a name, with the motives of the manufacturers in the du Pont cellophane case, who:

"Were guided by careful and objective considerations of utility and price. * * * Thus, small variations in price or quality would induce a manufacturer to shift from one flexible packaging material to another, in accordance with a balance of all the utilities toward the achievement of the most efficient economic operation."

A converse holding, based on the interchangeability test, is found in American Crystal Sugar Co. v. Cuban-American Sugar Co., D.C.S.D.N.Y., 1957, 152 F. Supp. 387 affirmed 2 Cir., 1958, 259 F.2d 524. There the court held refined sugar generally to be a line of commerce, whereas it had been contended that cane sugar and beet sugar were separate lines. This finding was upheld in the Court of Appeals, which noted that the two types of sugar are functionally interchangeable, notwithstanding the fact that cane sugar sells at a higher price than beet sugar, and that cane sugar has a greater public acceptance. A factor emphasized by the Court of Appeals was the sensitivity of the two types of sugar to price changes by one another.

Where does coal, as a boiler fuel, fit into this pattern? The Supreme Court has taken judicial notice of the competitive nature of fuels generally. West Ohio Gas Co. v. Public Utilities Commission, 1935, 294 U.S. 63, 72, 55 S.Ct. 316, 79 L.Ed. 761. This should be some indication that boiler fuels as a class are a line of commerce.

Application of the interchangeability test convinces me that there exists such a degree of cross-elasticity between coal and other boiler fuels as to constitute boiler fuels the relevant line of commerce in this case. Each of the boiler fuels— coal, oil, gas and atomic energy—is utilized in the same manner to produce the same result. As each is consumed power is produced to drive the generators which in turn produce electric energy. The

public demand being satisfied is for electric energy and the boiler fuel being utilized in the production thereof is not a material factor influencing the consumers' market.

What is presented here is the instance of a producer guided by careful and objective considerations of utility and price striving to achieve the most efficient economic operation, as in the du Pont case, rather than an instance of a non-objective consumer market, as in the Guerlain case. It is clear from this record that Tampa is basically concerned with factors of economic utility in its operation, as it is considering conversion of other oil burning units and expansion into the field of atomic energy as a source of power. Such decisions are motivated by a desire to render the best possible service at the lowest practical rates, while realizing a reasonable profit.

The factor of price sensitivity is also present in this case. Following the initial use of coal by Tampa its oil suppliers offered to reduce prices in order to meet the challenge of the new fuel.

I find that coal, oil, gas and atomic energy meet the interchangeability test and are components of the general line of boiler fuels. This contract, relating only to coal, cannot establish a monopoly in a "line of commerce" within the meaning of the Clayton Act, and accordingly cannot be violative thereof.

Even if coal is deemed to be the relevant line of commerce that alone does not establish a violation of the Clayton Act by this contract. In order that a requirements contract come within the terms of the Act its effect must be "to substantially lessen competition or tend to create a monopoly in any line of commerce." Requirements contracts are not per se illegal. United States v. Columbia Steel Co., 1948, 334 U.S. 495, 524, 68 S.Ct. 1107, 92 L.Ed. 1533; United States v. Bausch & Lomb Optical Co., 1944, 321 U.S. 707, 728–729, 64 S.Ct. 805, 88 L.Ed. 1024. Cf. Federal Trade Commission v. Curtis Publishing Co., 1923, 260 U.S. 568, 43 S.Ct. 210, 67 L.Ed. 408; Beloit

Culligan Soft Water Co. v. Culligan, Inc., 7 Cir., 1959, 274 F.2d 29. This fact was tacitly admitted in the Standard Oil decision, when it was recognized that:

> "Requirements contracts, on the other hand, may well be of economic advantage to buyers as well as to sellers, and thus indirectly of advantage to the consuming public." 337 U.S. 293, 306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371.

See dissenting opinion of Justice Frankfurter in Federal Trade Commission v. Motion Picture Advertising Service Co., 1953, 344 U.S. 392, 402, 73 S.Ct. 361, 97 L.Ed. 426.

What were the actual monopolistic consequences of this single contract? At the time it was entered into, in the entire State of Florida only 792,000 tons of coal were being consumed annually. It was conceded that within a short period of time the Gannon Station would be using amounts in excess of that to satisfy its requirements.

Looking only at those two figures the contract would appear, in fact, to have created a situation of monopoly in favor of the seller in Florida. However, it was also conceded that as a result of this contract Tampa became the only substantial consumer of coal in Florida. Further, at the time the contract was entered into coal accounted for less than 6% of the fuel consumed in the entire State of Florida, and every power-generating unit in Peninsular Florida burned oil in its boilers.

Tampa services an area of approximately 1,700 square miles covering only 3% of the total land area of Florida. Within that area resides approximately 11% of Florida's population.

Any monopoly which seller enjoys extends only to that area serviced by Tampa. Competition has not been foreclosed by this contract for the coal business of the utilities serving the remaining 97% of the state embracing the 89% of the population residing therein. I do not consider this evidence to fall within the area of economic inquiry rejected as ir-

relevant by the Supreme Court in Standard Oil of California v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371. In that case it was urged that in fact competition had flourished as a result of the contracts under attack. The Court said that in light of the fact that Standard Oil had 8,000 exclusive dealing contracts with 16% of the retail outlets selling 6.7% of all gasoline in a seven state area such evidence could not overcome the natural tendency of the contracts to substantially lessen competition and should not be considered. That situation is so far removed from the one at bar that I cannot consider the holding to militate against consideration of the market left free for competition after this contract.

It may be contended that this circumstance is too speculative and founded upon a mere possibility that other utilities may convert to the use of coal. In answer to that it need only be observed that prior to this contract Tampa was not a coal consumer, but that it made the change. It is not unreasonable that now, once coal in any significant quantity has been introduced into the Florida market, other utilities may follow suit. They are a presently existing potential market. The choice of conversion is up to them, as it was to Tampa, prodded perhaps by sales promotion on the part of coal companies wishing to acquire their business.

I cannot consider a single contract with a single utility serving only 3% of the land area and 11% of the population of a single state as "substantially lessening competition or tending to create a monopoly." The remainder of the utilities throughout the state are a potential market for free competition. If they choose not to deal in the commodity covered by the contract, for reasons of their own, that should not operate to invalidate the one contract already entered into.

Any contract of sale, to some degree, lessens competition, as it takes the particular buyer out of the competitive market for the commodity contracted for. But the Clayton Act requires more than that—the lessening must be substantial,

and substantiality is lacking where 89% of the potential consumers of a product in a state are free to deal among all who sell it. Cf. Excelsior Motor Mfg. & Supply Co. v. Sound Equipment, Inc., 7 Cir., 1934, 73 F.2d 725, certiorari denied 1935, 294 U.S. 706, 55 S.Ct. 352, 79 L.Ed. 1241.

Appellee has not cited any authority in which a single contract of such limited application as that under consideration has been held to violate the anti-trust laws. Indeed, in the prior decisions either or both of two elements, each of which is absent herein, existed.

This contract in no way resembles the so-called "tying agreements" where the owner of a patented product attempts to extend his patent monopoly by requiring the buyer to purchase non-patented articles also, International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; International Business Machines v. United States, 1936, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085; Oxford Varnish Corp. v. Ault & Wilborg Corp., 6 Cir., 1936, 83 F.2d 257; Radio Corp. of America v. Lord, 3 Cir., 1928, 28 F.2d 257; United States v. Linde Air Products Co., D.C.N.D.Ill., 1949, 83 F. Supp. 978; or where the seller had such market domination over a non-patented article as to be able to require the purchase of a "tied" product with it. Northern Pacific Railway Co. v. United States, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545; Judson L. Thomson Mfg. Co. v. Federal Trade Commission, 1 Cir., 1945, 150 F.2d 952, certiorari denied 1945, 326 U.S. 776, 66 S.Ct. 267, 90 L.Ed. 469; Signode Steel Strapping Co. v. Federal Trade Commission, 4 Cir., 1942, 132 F. 2d 48; United States v. American Can Co., D.C.S.D.Cal., 1949, 87 F.Supp. 18.

Those cases not involving tying agreements had the other principal element not found here—an actual monopoly in the relevant market. In Standard Fashion Co. v. Magrane-Houston Co., 1922, 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653, the seller controlled 40% of the nation's 52,000 pattern agencies by exclusive contract. In Fashion Originator's Guild v. Federal Trade Commission, 1941, 312 U.

S. 457, 61 S.Ct. 703, 85 L.Ed. 949, the manufacturers comprising the Guild sold 38% of all women's garments wholesaling at $6.75 and up and more than 60% of those at $10.75 and up. Dictograph Products Inc. v. Federal Trade Commission, 2 Cir., 1954, 217 F.2d 821, certiorari denied 1955, 349 U.S. 940, 75 S.Ct. 784, 99 L.Ed. 1268, involved exclusive dealing contracts tying up approximately 22% of the nation's 1,000 hearing aid distributors. The seller in Anchor Serum Co. v. Federal Trade Commission, 7 Cir., 1954, 217 F.2d 867, had exclusive dealing contracts with 16 wholesalers including the two largest in Illinois and Iowa, which were the two largest markets for its products. While not indicating the total amounts and percentages of business involved the Court did note that *one* of Anchor's 32 competitors had made over $500,000 in sales to the Illinois and Iowa wholesalers over a three year period, which business it lost as a result of the exclusive dealing contracts of the seller. The Pullman Co., United States v. Pullman Company, D.C.E.D.Pa.1943, 50 F. Supp. 123, was the sole supplier in the United States of railroad sleeping cars and car service, and had maintained that position partially by the use of exclusive dealing contracts.

Only in Standard Oil of California v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, and United States v. Richfield Oil Corp., D.C.S.D.Cal. 1951, 99 F.Supp. 280, affirmed 1952, 343 U.S. 922, 72 S.Ct. 665, 96 L.Ed. 1334, was the enormity of the seller's position in the market such as to be considered less than dominant. But even those cases present a situation much more aggravated than herein. In the Standard Oil case the seller had 8,000 exclusive dealing contracts with 16% of the independent service stations in a seven state area, although their sales constituted only 6.7% of the total gasoline sold. Furthermore, Standard's total sales constituted 23% of all the gasoline sold in the market. It was found in Richfield that 7,546 oral and written exclusive dealing contracts had been made by seller covering operations in six states and involving $43,173,000 in sales for the year 1950 alone.

Richfield was affirmed by the Supreme Court on the authority of Standard Oil. In this regard, it is important to note the interpretation of the Standard Oil decision by Justice Frankfurter, who wrote the opinion:

"In any event, in the Standard Oil case, we recognized the discrepancy in bargaining power [between seller and buyer] and pointed out that retailers might still insist on exclusive contracts if they wanted." Federal Trade Commission v. Motion Picture Advertising Service Co., 344 U.S. 392, dissent at page 402, 73 S.Ct. 361, at page 367, 97 L.Ed. 426.

The importance of disparity in bargaining power in anti-trust cases has been recognized by the Supreme Court. Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 611, 73 S.Ct. 872, 97 L.Ed. 1277.

There was no inequality of bargaining power in this case. The seller was but one of 700 coal producers capable of serving the buyer, and was not shown to be of such size as to be capable of any economic coercion. The buyer has not been shown to have been capable of exerting any unreasonable demands in its own behalf. For all that appears, the contract was freely negotiated, and a fair reading of it gives one the impression that it was equitable to both parties in all material regards.

The seller would have the Court impose extra-judicial sanctions not provided by Congress to relieve it of its contractual obligations. If this is permitted without the utmost caution, the door may open wide to inconsequential allegations of anti-trust violations in every action on a contract of any substantial magnitude. While this might be good for anti-trust lawyers, it is doubtful whether it would be of much benefit to anyone else. It would certainly have a tendency to clog the courts with protracted litiga-

tion. Although this might put an end to anti-trust violations, it could, as Justice Jackson pointed out in Bruce's Juices,[9] have a devastating effect upon all business.

I would reverse the decision below.

---

9. 1947, 330 U.S. 743, 754, 67 S.Ct. 1015, 91 L.Ed. 1219.